**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAUREEN LEESON, | NO. CV 08-268-E |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**PROCEEDINGS**

Plaintiff filed a Complaint on January 16, 2008, seeking review of the Commissioner's denial of benefits.  The parties filed a "Consent to Proceed Before a United States Magistrate Judge" on May 23, 2008.

Plaintiff filed a "Motion for Summary Judgment or Remand" on June 20, 2008.  Defendant filed "Defendant's Motion for Summary Judgment" on September 4, 2008.  The Court has taken both motions under submission without oral argument.  See L.R. 7-15; "Order," filed January 22, 2008.

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

Plaintiff, a physical therapist and college instructor in physical therapy, filed an application for disability insurance benefits on April 26, 2002 (Administrative Record ("A.R.") 83-85). Plaintiff alleged disability due to bilateral arm pain and swelling since June 12, 2000 (A.R. 88-89). Plaintiff's insured status continued through March 23, 2006 (A.R. 335).[1]

The Social Security Administration denied Plaintiff's application initially (A.R. 76). Plaintiff requested a hearing, which an Administrative Law Judge ("ALJ") conducted on November 19, 2002 (A.R. 68-75, 278-308). The ALJ examined the medical record and heard testimony from Plaintiff, a medical expert, and a vocational expert (A.R. 278-308). On January 21, 2003, the ALJ issued an unfavorable decision, finding that Plaintiff had returned to her past relevant work and had engaged in substantial gainful activity since the alleged disability onset date (A.R. 40-41). The ALJ therefore denied benefits (A.R. 41).

By order dated May 2, 2003, the Appeals Council vacated the ALJ's January 21, 2003 decision and remanded the matter for further proceedings (A.R. 21-23). The Appeals Council found that recently-submitted evidence: (1) established that certain of the amounts shown on Plaintiff's earnings statements were due to long-term disability

---

[1]      In order for Plaintiff to be eligible for disability benefits, Plaintiff must establish that she became disabled prior to the expiration of her insured status. See 42 U.S.C. § 416(i)(2)(C), 416(i)(3)(A); 20 C.F.R. 404.131(a).

insurance payments; and (2) suggested that any work activity after the onset date was due to special accommodations from Plaintiff's employer (A.R. 21).[2]

On remand, the ALJ found, without a further hearing, that the record evidence demonstrated Plaintiff had performed substantial gainful activity from at least January 2001 through May 2001 – when Plaintiff was teaching a physical therapy class (A.R. 14-15 (November 5, 2003 decision)).  The ALJ further found that, by March 2002, Plaintiff was capable of performing her past relevant work as a college instructor based on the earlier testimony of the medical and vocational experts (A.R. 16-17).  The Appeals Council denied review of the ALJ's November 5, 2003 decision (A.R. 382-84).

On August 6, 2004, Plaintiff filed a complaint with this Court, case number CV 04-6559-E, seeking review of the Commissioner's denial of benefits.  The parties stipulated to a remand pursuant to sentence four of 42 U.S.C. section 405(g), for further administrative proceedings before a different ALJ (A.R. 392-93).  The parties agreed the ALJ should be instructed to: (1) give further consideration to Plaintiff's residual functional capacity; (2) seek additional vocational expert evidence regarding Plaintiff's past relevant work as

---

[2]     In remanding, the Appeals Council ordered the ALJ to: (1) give further consideration to Plaintiff's work activity following the alleged onset date; (2) consider Plaintiff's treating source opinions (which were not previously discussed); (3) obtain additional evidence concerning Plaintiff's alleged impairments; (4) evaluate Plaintiff's subjective complaints; and (5) give further consideration to Plaintiff's residual functional capacity (A.R. 22).

a physical therapy instructor; and (3) as warranted, consider Plaintiff's ability to do other work in the national economy (A.R. 393).  The Court issued a judgment of remand, and the Appeals Council remanded the case to a new ALJ with instructions (A.R. 389-90, 398-400).

The new ALJ held a hearing on February 16, 2006 (A.R. 426-45). The ALJ heard testimony from a vocational expert (Id.).  Plaintiff was not present and did not offer any additional testimony (A.R. 428). Counsel for Plaintiff advised the ALJ that Plaintiff had returned to work in 2004 and had authorized counsel to speak on Plaintiff's behalf (Id.).  Counsel requested the ALJ to consider Plaintiff for a closed period of disability from June 12, 2000 through October 17, 2004, when Plaintiff returned to work (A.R. 431).

On March 23, 2006, the ALJ issued an unfavorable decision (A.R. 327-36).  The ALJ found that Plaintiff had engaged in substantial gainful activity from January 12, 2001 through May 25, 2001 (A.R. 329-30 (citing 20 C.F.R. 404.1573(b)).  For the closed period from May 25, 2001 through October 17, 2004, when Plaintiff was not performing substantial gainful activity, the ALJ found Plaintiff suffered from severe impairments affecting her right wrist and left elbow, but those impairments did not meet or equal a listed impairment (A.R. 330).

The ALJ assessed Plaintiff with a residual functional capacity restricted by "inability for more than simple gripping and minimal power grasping and fine manipulation with the right upper (major) extremity and an overall lifting restriction to a combined weight of

chest to overhead a total of about 25 pounds using both hands, minimal
pushing and pulling, and no extensive keyboarding" (A.R. 335-36
(adopting treating physician's January 31, 2001 residual functional
capacity assessment at A.R. 131)).   The ALJ found that a person with
Plaintiff's limitations could perform Plaintiff's past relevant work
as a physical therapy instructor as that job is normally performed in
the national economy (A.R. 334 (adopting vocational expert testimony
at A.R. 432-36 for a "vocational ed instructor")).   Alternatively, the
ALJ found that a person with Plaintiff's limitations could perform
other unskilled light work existing in significant numbers in the
national economy (i.e., as a parking lot attendant or photocopy
machine operator) (A.R. 334-35 (adopting vocational expert testimony
at A.R. 436-37)).   The ALJ therefore denied benefits (A.R. 336).   The
Appeals Council denied review (A.R. 4-6).

## STANDARD OF REVIEW

Under 42 U.S.C. section 405(g), this Court reviews the
Administration's decision to determine if: (1) the Administration's
findings are supported by substantial evidence; and (2) the
Administration used proper legal standards.   See DeLorme v. Sullivan,
924 F.2d 841, 846 (9th Cir. 1991); Swanson v. Secretary of Health and
Human Serv., 763 F.2d 1061, 1064 (9th Cir. 1985).   Substantial
evidence is "such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion."   Richardson v. Perales, 402 U.S.
389, 401 (1971) (citation and quotations omitted).
///

This Court "may not affirm [the Administration's] decision

1  simply by isolating a specific quantum of supporting evidence, but

2  must also consider evidence that detracts from [the Administration's]

3  conclusion."  Ray v. Bowen, 813 F.2d 914, 915 (9th Cir. 1987)

4  (citation and quotations omitted).  However, the Court cannot disturb

5  findings supported by substantial evidence, even though there may

6  exist other evidence supporting Plaintiff's claim.  See Torske v.

7  Richardson, 484 F.2d 59, 60 (9th Cir. 1973), cert. denied, 417 U.S.

8  933 (1974); Harvey v. Richardson, 451 F.2d 589, 590 (9th Cir. 1971).

9

10                              **DISCUSSION**

11

12      After consideration of the record as a whole, Defendant's

13  motion is granted and Plaintiff's motion is denied.  The

14  Administration's findings are supported by substantial evidence and

15  are free from material[3] legal error.

16

17  **I.    Substantial Evidence Supports the Administrative Decision.**

18

19      Entitlement to disability insurance benefits requires a

20  conclusion that a claimant's impairments "are of such severity that he

21  is not only unable to do his previous work but cannot, considering his

22  age, education and work experience, engage in any other kind of

23  substantial gainful work which exists in the national economy."

24

25          [3]    The harmless error rule applies to the review of

26  administrative decisions regarding disability.  See Curry v.

    Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1990); see also Stout v.

27  Commissioner, 454 F.3d 1050, 1054 (9th Cir. 2006); Batson v.

    Commissioner, 359 F.3d 1190, 1196 (9th Cir. 2004); Tonapetyan v.

28  Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

1  42 U.S.C. § 423(d)(2)(A).  As noted above, the ALJ found Plaintiff

2  capable of performing other work existing in the national economy for

3  the closed period from June 12, 2000 through October 17, 2004.

4  Substantial evidence supports this finding.

5

6      **A.    The Medical Record**

7

8      The record contains a number of reports from orthopedic

9  surgeon, Dr. John Itamura, who treated Plaintiff from June 9, 2000

10  through September 6, 2002 (A.R. 122-52, 255-61).  Plaintiff first

11  presented with complaints of right wrist pain and left elbow pain with

12  lifting (A.R. 150).  An examination revealed a "click" in Plaintiff's

13  right wrist and tenderness, but no instability (Id.).  Dr. Itamura

14  diagnosed Plaintiff with "medial epicondylitis, left," a "subluxing

15  ulnar nerve," and "cervical spondylosis" (A.R. 151).  Dr. Itamura

16  noted that further testing should be done to "rule out [a] TFCC

17  [triangular fibrocartilage complex] tear" in Plaintiff's right wrist

18  (A.R. 151, 160).  He ordered magnetic resonance imaging of Plaintiff's

19  right wrist, Motrin and physical therapy (A.R. 151).[4]

20

21      On June 21, 2000, Dr. Itamura reported that the MRI of

22  Plaintiff's right wrist confirmed a TFCC tear, for which he

23  recommended surgery (A.R. 163).  On June 26, 2000, Plaintiff underwent

24  right wrist arthroscopy and synovectomy with debridement of the TFCC

25  tear to stabilize the wrist, and also received a steroid injection in

26  _____

27      [4]    At the time of his initial examination, Dr. Itamura
    opined that Plaintiff should be precluded from lifting more than
28  five pounds with her left upper extremity and should not lift
    anything with her right upper extremity (A.R. 151).

7

her left elbow medial epicondylar region (A.R. 160-62).  When
Plaintiff returned to Dr. Itamura on July 14, 2000 for a post-
operative evaluation, Dr. Itamura reported that Plaintiff was "doing
quite well" with physical therapy and that her motion was "better"
(A.R. 155).  Dr. Itamura noted that Plaintiff should continue with her
physical therapy (Id.).

On July 28, 2000, Plaintiff complained of subluxation of her
right distal radioulnar joint (i.e., a partial dislocation in her
wrist, where her radius and ulna meet),[5] which Dr. Itamura confirmed
on examination (A.R. 146; see also A.R. 143 (August 25, 2000 report
noting continued instability of the distal radioulnar joint)).
Otherwise, Plaintiff's motion was "good" and her swelling and
inflammation was "down," with no noted tenderness (Id.).  On
September 20, 2000, Plaintiff reported that she still could not do
weight-bearing activity with her right wrist, but that she was
improving (A.R. 140).  Dr. Itamura noted on examination that
Plaintiff's distal radioulnar joint did not seem to be as
"subluxatable" as before (Id.).  At that time, Dr. Itamura opined that
Plaintiff would remain totally temporarily disabled, given the "large
amount of manual manipulation" required by Plaintiff's work (A.R. 140-
41).  As of October 18, 2000, Dr. Itamura's goal was to get Plaintiff

---

[5]    All anatomical explanations are from the illustrations of
Gray's Anatomy of the Human Body (20th ed. 1918), available at
http://www.bartleby.com/107 (last visited Sept. 24, 2008).

back to "modified duty" by December 2000 (A.R. 137).[6]

Dr. Itamura prepared a "Permanent and Stationary Report" on January 31, 2001 – shortly after plaintiff began teaching again (A.R. 130-32, 277). Plaintiff had reported a "flare" since her last visit with Dr. Itamura, with a return of burning pain (A.R. 130). On examination, Dr. Itamura noted that Plaintiff's ulnar head was more prominent on her right side than on her left side in relaxed pronation (Id.). Dr. Itamura also noted that Plaintiff's left elbow still had a significant amount of lipid atrophy over her medial epicondyle and her ulnar nerve was still subluxatable (Id.). Dr. Itamura opined that Plaintiff should have the following permanent restrictions:

> She can use her right upper extremity for simple
> gripping, but fine manipulation and power grasping
> should be kept to a minimal [sic]. In addition, her
> lifting restrictions should be a combined weight of
> chest to overhead a total of about 25 pounds using both
> hands. Pushing and pulling should also be kept to
> minimal [sic]. I do think that teaching duties would be

---

[6] On November 17, 2000, notwithstanding Plaintiff's complaints of: (1) instability of her right distal radioulnar joint; (2) irritability of her right upper extremity with resulting temperature and color changes in the extremity; (3) irritability of her left ulnar nerve from loss of subcuticular fat in her left elbow due to the steroid injection; (4) decreased ability to weight bear with her right wrist and hand; (5) decreased strength and endurance in her right upper extremity; and (6) increased sensitivity and decreased tolerance of light touch and pressure to her left elbow, Dr. Itamura opined that Plaintiff could return to "modified duty," excluding any manual physical therapy, as of December 1, 2000 (A.R. 135-36).

1    appropriate for her, however, extensive use of the

2    keyboard may be difficult for her.

4  (A.R. 131).[7]

6    On August 1, 2001, Dr. Itamura prepared an addendum to his

7  earlier permanent and stationary report (A.R. 124-26).  Dr. Itamura

8  again reported that Plaintiff's problem is bilateral, explaining:

10    Her right upper extremity, she has problems with the

11    distal radioulnar joint.  Because of the subluxation

12    when the forearm is in pronation, she cannot weightbear

13    [sic].  She has weakness and pain mostly ulnar sided.

15    Her left elbow, where I had injected her medial

16    epicondyle, with subsequent lipid necrosis and

17    sensitivity of her ulnar nerve.  Dr. Stevanovic had seen

18    her and injected her medial antebrachial cutaneous nerve

19    with good relief of her symptoms, however, following

20    that she had significant ulnar sided paraesthesias.  She

21    has significant problems, especially with flexion and

22    extension and weakness of her intrinsics.  On exam of

23    the left upper extremity, the area of the lipid necrosis

24    is decreasing, however, she still has an area of atrophy

25    in the region of her medial epicondyle.

---

[7]    Dr. Itamura completed a form dated March 26, 2001 listing
similar restrictions, including the 25-pound weight limit (A.R.
228).  Where the form asked whether he expected the patient's
condition to improve in the future, Dr. Itamara wrote "?" (Id.).

(A.R. 124).  Unlike his prior assessments, Dr. Itamura now opined that Plaintiff should "progress" to lifting three pounds overhead, should be limited to lifting floor to waist and waist to chest 10 pounds, and to pulling five pounds, and should avoid prolonged gripping and twisting of objects (A.R. 125).[8]  Dr. Itamura completed a Physical Residual Functional Capacity Questionnaire on October 15, 2002 reporting similar restrictions (A.R. 258-61 (noting that Plaintiff could occasionally lift less than 10 pounds and never lift more, and must periodically alternate between sitting and standing to relieve left elbow irritation from being in a prolonged bent position)); see also A.R. 421 (July 23, 2003 letter from Dr. Itamura noting that he had reviewed Plaintiff's case and believed her restrictions remained

---

[8]    In a "Supplemental Report" dated April 1, 2002, Dr. Itamura summarized Plaintiff's elbow and wrist problems and opined that Plaintiff had lost 75 percent of her pre-injury capacity to lift, push, pull, torque, grasp and the use of finger dexterity of her upper extremities secondary to Plaintiff's injuries (A.R. 122). Dr. Itamura said that Plaintiff would not be able to put up with the repetitive stress which her occupation requires (Id.).  The report contains no detail concerning any further testing that Dr. Itamura may have done to reach his opinion.

Dr. Itamura provided another "Supplemental Report" dated September 6, 2002 for Plaintiff's work-related disability claim (A.R. 255-57).  Dr. Itamura explained that he felt Plaintiff had lost 75 percent of her pre-injury ability in her right upper extremity, and 15 percent loss for her use of finger dexterity, 50 percent loss for gross grip on repetition, and 75 percent loss of pre-injury capacity for two or three repetitions for lift, push, pull, torque and grasp in Plaintiff's left upper extremity (A.R. 255).  Dr. Itamura suggested that Plaintiff should be given a lifetime gym membership for her physical therapy needs (A.R. 256). As with the earlier evaluations, Dr. Itamura's report did not provide any detail concerning any testing that may have been done to support Dr. Itamura's opinion (Id.).

1  the same as assessed on October 15, 2002)).[9]

2

3       Consultative examiner, Dr. Stuart Kuschner, evaluated Plaintiff

4  on March 25, 2002, for a second opinion concerning further surgery to

5  Plaintiff's right wrist (A.R. 231-32).  Plaintiff complained of

6  "burning pain and spasm in her right forearm and into her shoulder and

7  right side of her neck," "intermittent pain in the ulnar side of her

8  wrist" and "'intermittent sympathetic changes' in her right wrist,

9  forearm, and hand" (A.R. 232).  Plaintiff reported an unstable right

10 distal radioulnar joint (with "episodes of instability"), and

11 intermittent numbness and tingling in her fingers, alternating between

12 the ulnar and radial nerve origin (A.R. 232, 238).  However, Plaintiff

13 reportedly went to the gym one to two hours per day, six days per week

14 for limited activities (A.R. 233).  Plaintiff was taking the anti-

15 inflammatory medication Mobic daily (A.R. 234).

16

17      Upon examination, Dr. Kuschner noted that Plaintiff

18 demonstrated full range of motion of both elbows without a complaint

19 of pain, no pain with palpation over the lateral and medial epicondyle

20 of either elbow, and negative Tinel tests (A.R. 236).  Plaintiff's

21 right hand had a slight purplish discoloration of the digits, but

22 otherwise had no abnormal masses, swelling, erythema or ecchymosis

23 (A.R. 237).  Phalen, Finkelstein and Provocative tests were negative,

24 bilaterally (Id.).  Plaintiff's grip strength on the right was 62, 74,

25

───────────────

26      [9]    Plaintiff's physical therapist reported that Plaintiff
   would be unable to lift or carry more than five pounds given the
27 instability of Plaintiff's right wrist (A.R. 250).  The therapist,
   however, did not provide any of Plaintiff's physical therapy
28 records.

and 62 pounds; left was 70, 65, and 62 pounds (Id.).  Plaintiff

demonstrated full active range of motion of all digits of both hands

and full supination and pronation of both forearms (Id.).  As

Dr. Itamura previously had found, Dr. Kuschner noted a slight dorsal

prominence of the right distal ulna as compared to the left distal

ulna when Plaintiff's forearms were fully pronated (A.R. 238).

Dr. Kuschner, however, did not see any subluxation of the extensor

carpi ulnaris tendon with pronation/supination of the right forearm,

and noted that the right distal radial ulnar joint appeared grossly

stable with stress testing (Id.).  Radiology tests showed no evidence

of any gross carpal instability (Id.).  Dr. Kuschner opined that

Plaintiff's treatment options were surgery or modified activities to

accommodate the distal radial ulnar joint instability pattern (Id.).

Dr. Kuschner's report does not identify how Plaintiff's activities

should be modified.

     A state agency physician completed a Physical Residual

Functional Capacity Assessment for Plaintiff dated May 21, 2002, for a

limited range of light work (A.R. 240-47 (noting "see consult")).[10]

Specifically, the physician opined that Plaintiff would be limited in

her upper extremities by preclusion from "frequent forceful

---

[10]     "Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to 10
pounds.  Even though the weight lifted may be very little, a job is
in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls." 20 C.F.R. §
404.1567(b); see also U.S. Department of Labor, Dictionary of
Occupational Titles, Appendix C Components of the Definition
Trailer (4th ed., Rev. 1991), http://www.oalj.dol.gov/PUBLIC/
DOT/REFERENCES/DOTAPPC.HTM (similarly defining "light" work).

1  grasping/twisting with [her] right hand and fingers" (A.R. 241, 243).
2  The physician noted no other limitations.

4  **B.    The Medical Expert's Analysis of the Medical Record**

6  At Plaintiff's first administrative hearing, the medical
7  expert, orthopedic surgeon Dr. Michael Gurvey, summarized the medical
8  record as follows:

10  [Plaintiff] has problems with the right and left upper
11  extremities.  The – relative to the right upper
12  extremity[,] she had arthroscopy for a tear of the
13  triangular fibrocartilage, and a partial [synovectomy]
14  with apparently good results.  On the right upper
15  extremity she has a history of subluxation of the right
16  distal radioulnar joint.  This was noted by Dr.
17  [Itamura] in [Exhibit] 1F, who I believe is the treating
18  doctor.  It was noted in [Exhibit] 4F, dated 3/25/02 by
19  Dr. [Kuschner] who was a consultative examiner.  The
20  second area as to the left upper extremity she has a
21  chronic [epicondylitis], which is an inflammatory
22  reaction of the area of the elbow on the inner portion
23  with the tendons and muscles and (inaudible).  No
24  surgeries done about this.  There was some history of a
25  subluxation of the left ulnar nerve of the elbow.  There
26  is no evidence, however, of neuropathy.  Now the last
27  records and the first batch of data that I got as far as
28  examining doctors was Dr. [Kuschner], consulting

1       examiner in [Exhibit] 4F date 3/25/02.  Subsequent

2       Exhibits 8F and 9F, former dated 9/6/02, the second, the

3       later 10/15/02, basically, dealt with Dr. [Itamura]

4       sending a supplemental report to Workman's Compensation.

5       It doesn't really go into any physical examination,

6       either of those two.  He lists some restrictions which

7       he eluded [sic] to in the prior exhibits.

8

9   (A.R. 280-81).  From his review of the record, Dr. Gurvey opined that

10  Plaintiff did not suffer from any ongoing disability (A.R. 282-83).

11  Dr. Gurvey opined that Plaintiff would be capable of light work with

12  mild to moderate limitations in her ability to push/pull, moderate

13  limitations in her right upper extremity for forceful grasping and

14  torquing, twisting moves, and mild limitations in her ability to do

15  repetitive forceful grasping and twisting moves with her upper left

16  extremity (A.R. 284 (noting the main difference between his assessment

17  and Dr. Itamura's last assessments of Plaintiff's capacity is the

18  amount of weight that Plaintiff could lift)).[11]  Dr. Gurvey confirmed

19

20          [11]   Dr. Gurvey disagreed with Dr. Itamura's September 2002
    residual functional capacity assessment, explaining:

21

22          [Dr. Itamura] felt that she had lost 75% of her
            functional capacity in the left upper extremity for
23          push/pull (inaudible) for repetitive motion on a
            repetitive basis.  He felt that she lost 50% of her loss
24          of grip.  And 15% of loss of fingering.  I don't agree
            with that based on the records, because there's no
25          evidence of ulnar neuropathy, there's just evidence of
            pain about the elbow.  I would agree that it would. . .
26          create a problem relative to some repetitive grasping,
            twisting of the left upper extremity.  I would have put
27          it in the mild limitation category.  And I don't believe
            the epicondylitis in itself has a problem with regard to
28                                              (continued...)

that a person with an unstable distal radioulnar joint would be able
to lift up to 20 pounds - 10 pounds with each arm (A.R. 286).  He
explained:

> [T]he problem is generally movement with the arm in a
> pronated position, or with the palm down.  So one
> doesn't normally do lifting in that position.  You
> can't.  So I put it in the moderate category based on
> the fact that there are some positions where one would
> lift with the, with the hands in the pronated situation.
> In that instance, the joint could be unstable.  If one
> did it with the forearm supinated or palm up, that
> stabilizes the situations not particularly unstable.  So
> I think that's why I gave a moderate limitation.  I felt
> it was not severe, it was not mild.  I thought moderate
> was a fair estimate, and I put it in that category
> rather than giving percentages of what Dr. [Itamura]
> said that's all.

(A.R. 286-87).


C.    The Vocational Expert's Testimony


The vocational expert testified that a person with the

---

[11](...continued)
fine manipulation or fingering, so there's a problem
there.

(A.R. 283-84).

limitations Dr. Itamura first found to exist in January 2001 (less than 12 months after the alleged onset date), adopted by the ALJ, could perform work existing in the local economy as a parking lot attendant or photocopy machine operator (A.R. 432, 435-37 (noting that there are approximately 5,000 local parking lot attendant jobs and 2,500 local photocopy machine operator jobs)).  This testimony furnishes substantial evidence that Plaintiff could perform other work existing in significant numbers in the region, and therefore Plaintiff is not entitled to disability benefits for the closed period.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); see also Barker v. Secretary, 882 F.2d 1474, 1478-80 (9th Cir. 1989); Martinez v. Heckler, 807 F.2d 771, 775 (9th Cir. 1986); Mickelson-Wurm v. Commissioner Social Sec. Admin., 2008 WL 2795881 *4 (9th Cir. July 21, 2008) (unpublished disposition) (noting that the Court has previously held that between 1,000 and 1,500 jobs in the regional economy constitutes a "significant number" for purposes of the Social Security Act); see generally 42 U.S.C. § 423(d)(2)(A).[12]

II.   **Plaintiff's Various Arguments Are Unavailing.**

Plaintiff contends that: (1) the ALJ erred in finding that Plaintiff had engaged in substantial gainful activity since her alleged disability onset date because Plaintiff was given "special accommodations"; (2) the ALJ erred in rejecting Dr. Itamura's opinion concerning Plaintiff's work restrictions, and "selectively edited" the

---

[12]   The Court may cite unpublished Ninth Circuit opinions issued on or after January 1, 2007.  See U.S. Ct. App. 9th Cir. Rule 36-3(b); Fed. R. App. P. 32.1(a).

1   evidence in the record to justify the conclusion that Plaintiff is not

2   disabled; (3) the ALJ erred in finding that Plaintiff had the ability

3   to perform her past relevant work as a physical therapy instructor;

4   and (4) the ALJ erred in relying on earlier credibility findings which

5   Plaintiff claims were not supported by substantial evidence.  See

6   Plaintiff's "Motion for Summary Judgment or Remand," pp. 3-10.  None

7   of these contentions merits relief.[13]

8

9        Plaintiff argues that the ALJ failed properly to assess the

10  opinion of Dr. Itamura in finding that Plaintiff retained the residual

11  functional capacity to do limited light work.  Where, as here, a

12  treating physician's opinion is contradicted, the ALJ may reject the

13  opinion by setting forth "specific, legitimate reasons" for doing so.

14  Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987); Orn v. Astrue, 495

15  F.3d 625, 631-33 (9th Cir. 2007) (discussing same). "The ALJ must do

16  more than offer his conclusions.  He must set forth his own

17  interpretations and explain why they, rather than the [physician's],

18  are correct."  Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988).

19  "Broad and vague" reasons for rejecting the treating physician's

20  opinion do not suffice.  McAllister v. Sullivan, 888 F.2d 599, 602

21  (9th Cir. 1989).

22

23       Here, the ALJ's March 23, 2006 decision expressly rejected

24  Dr. Itamura's later, more restrictive residual functional capacity

25  assessments (A.R. 332).  The ALJ stated legally sufficient reasons for

26

27       [13]    The Court has considered all of Plaintiff's arguments and
    has found those arguments unpersuasive.  The Court discusses
28  Plaintiff's principal arguments herein.

1  doing so, explaining:

2

3      The ALJ believes that, at best, claimant had brief

4      exacerbation(s) after [Dr. Itamura's] January 2001

5      report,[14] but that she has not swayed from the

6      assessment therein provided insofar as her sustained

7      work capacities starting in March 2002.  First, the data

8      reported by Dr. Itamura in the subsequent reports [to]

9      January 2001 primarily relate to claimed increased

10      symptoms.  In any event, only in March and August 2001

11      does [Dr. Itamura] provide us with any data [for] the

12      examination conducted.  His responses on the October

13      2002 form state that the claimant has right upper

14      extremity instability with intermittent swelling and

15      left ulnar neuropathy with positive Tinel's sign and

16      intermittently decreased range of motion, but these

17      findings are not described in any examination post

18      August 2001.  Secondly, in March 2002, the month prior

19      to the April 2002 report, Dr. Kuschner's evaluation of

20      the left elbow showed full active range of motion

21      without complaint of pain, negative Tinel at the level

22      of the cubital tunnel, and no pain with palpatation over

23      the lateral or medial epicondyle [].  He did not relate

24  ────────────────

25      [14]    The record supports the characterization of Plaintiff's
troubles as "brief exacerbations."  In her request for a hearing
26  filed after Dr. Kuschner's consultative examination, Plaintiff
reported that she suffered from "intermittent exacerbations of
27  symptoms [in her] bilateral upper extremities[,] treated with anti-
inflammatory medication, physical therapy and self management
28  techniques" (A.R. 116).

1       any of the left elbow abnormalities that Dr. Itamura

2       reported in the March and August 2001 reports.  In fact,

3       her "present complaint" was restricted to "right major

4       wrist."

5

6  (A.R. 332).  The ALJ summarized Dr. Kuschner's examination findings,

7  and noted they "do not comport with those related by Dr. Itamura in

8  [March] and August 2001 and, as noted, Dr. Itamura's other subsequent

9  reports are either totally lacking in objective data, or, as in

10  October 2002, state them in conclusory terms without reference to any

11  specific examination after March 2002" (Id.).  Finally, the ALJ also

12  noted that the medical examiner relied heavily on Dr. Kuschner's

13  report and did not agree with Dr. Itamura's assessment (Id.).

14

15       An ALJ properly may reject treating physicians' conclusory

16  assessments when unsupported by adequate clinical findings.  See,

17  e.g., Matney v. Sullivan, 981 F.2d 1016, 1019-20 (9th Cir. 1992);

18  Burkhart v. Bowen, 856 F.2d 1335, 1139-40 (9th Cir. 1988); Young v.

19  Heckler, 803 F.2d 963, 967-68 (9th Cir. 1986); see also Bayliss v.

20  Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (contradiction between

21  treating physician's assessment and clinical notes justifies rejection

22  of assessment); Batson v. Commissioner, 359 F.3d 1190, 1195 (9th Cir.

23  2004) ("an ALJ may discredit treating physicians' opinions that are

24  conclusory, brief, and unsupported by the record as a whole . . . or

25  by objective medical findings"); Connett v. Barnhart, 340 F.3d 871,

26  875 (9th Cir. 2003) (treating physician's opinion properly rejected

27  where treating physician's treatment notes "provide no basis for the

28  functional restrictions he opined should be imposed on [the

20

1   claimant]").  Similarly, an ALJ properly may reject a treating

2   physician's opinion that is predicated on the properly discounted

3   subjective complaints of the claimant.  Fair v. Bowen, 885 F.2d 597,

4   605 (9th Cir. 1989).  Accordingly, the Court finds no material error

5   in the ALJ's rejection of Dr. Itamura's latest assessments in

6   determining Plaintiff's residual functional capacity.

7

8        Plaintiff also argues that the ALJ failed properly to assess

9   her credibility by failing to make any credibility findings, and,

10  instead, relying on the prior ALJ's credibility assessment.  See

11  Plaintiff's "Motion for Summary Judgment or Remand," p. 10.  Plaintiff

12  did not offer any new testimony concerning her alleged impairments on

13  remand.  Rather, Plaintiff relied on prior testimony that the prior

14  ALJ previously had rejected (A.R. 15-16, 295-96, 301-06).

15

16       In the November 9, 2002 administrative hearing, Plaintiff

17  claimed that she suffered from pain and instability and loss of

18  function in both upper extremities (A.R. 302).  She testified that she

19  goes to the gym every day for about an hour for a "very limited"

20  workout compared to what she used to do (A.R. 303-04 (describing "very

21  limited" as "I can't swim")).  Plaintiff said she cannot take exercise

22  classes anymore, does a very limited weight program lifting no more

23  than three pounds, is able to do one hour on the treadmill, and goes

24

25

26

27

28

21

1   to the gym to keep the rest of her body in shape (A.R. 303-04).[15]

3       In finding Plaintiff not disabled, the ALJ noted that
4   Plaintiff's allegations were credible only to the extent that the
5   allegations comport with the ALJ's residual functional capacity
6   assessment (A.R. 335).  Ordinarily, such a notation would not state a
7   legally sufficient credibility finding.[16]  However, the prior ALJ

---

9   [15]   In a pain questionnaire dated May 15, 2002, Plaintiff
10  reported that she could do modified exercise at the gym, modified
    yoga, limited cooking (with no lifting of heavy pots or chopping of
11  certain foods), limited driving, and modified household chores
    (A.R. 101-02).   Plaintiff said that she could not do manual
12  physical therapy, and must limit her writing and computer use (A.R.
    102).  She also reported she could not do sailing, golf, tennis,
13  swimming, riding a bicycle, or skiing (Id.).

15      In a daily activities questionnaire of the same date,
    Plaintiff asserted that she could climb stairs but would avoid
16  lifting whenever possible (A.R. 114).  She could carry grocery bags
    from her car to her apartment three to four times per week (without
17  indicating a weight limit on what she could carry), and used a
    backpack where possible to carry objects (Id.). Plaintiff reported
18  that she was able to walk and hike (Id.).

19  [16]   To reject as not credible a claimant's testimony
    concerning his or her limitations, at a minimum the ALJ must make
20  "specific, cogent" findings, supported in the record, to justify
    the rejection.   See Robbins v. Social Sec. Admin., 466 F.3d 880,
21  883 (2006); Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)
    (citing Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) and
22  Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990)); Holohan
    v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) (the ALJ must
23  "specifically identify the testimony [the ALJ] finds not to be
    credible and must explain what evidence undermines the testimony");
24  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) ("The ALJ must
25  state specifically which symptom testimony is not credible and what
    facts in the record lead to that conclusion.").

27  In the absence of evidence of "malingering," most recent Ninth
    Circuit cases have applied the arguably more rigorous "clear and
28  convincing" standard.   See, e.g., Carmickle v. Commissioner, 533
                                              (continued...)

1   expressly had found Plaintiff's testimony not fully credible based in
2   part on Plaintiff's description of her activities of daily living
3   (A.R. 15-16).   The prior ALJ's determination was legally sufficient
4   and the present ALJ properly could rely on that determination.
5
6       The ALJ's credibility findings "must be sufficiently specific
7   to allow a reviewing court to conclude the ALJ rejected the claimant's
8   testimony on permissible grounds and did not arbitrarily discredit the
9   claimant's testimony." Moisa, 367 F.3d at 885.   To find the claimant
10  not credible, an ALJ may rely on (1) reasons unrelated to the content
11  of the subjective testimony (e.g., reputation for dishonesty);
12  (2) internal contradictions in the testimony; or (3) conflicts between
13  the claimant's testimony and the claimant's conduct (e.g., engaging in
14  daily activities inconsistent with the alleged symptoms, performing
15  work inconsistent with the alleged symptoms, or failing, without
16  adequate explanation, to take medication, to seek treatment or to
17  follow a prescribed course of treatment). Lingenfelter v. Astrue, 504
18  F.3d at 1040; Orn, 495 F.3d at 636; Robbins, 466 F.3d at 883; Burch v.
19  Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005); Thomas v. Barnhart,
20  278 F.3d 947, 958-59 (9th Cir. 2002); SSR 96-7p.
21  ///
22  ///
23  _____
24      [16](...continued)
    F.3d 1155, 1160 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d
25  1028, 1036 (9th Cir. 2007); Robbins, 466 F.3d at 883; Moisa v.
    Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Connett v. Barnhart,
26  340 F.3d 871, 873 (9th Cir. 2003); Ballard v. Apfel, 2000 WL
    1899797 *2 n.1 (C.D. Cal.  Dec. 19, 2000) (collecting cases).   In
27  the present case, the ALJ's findings incorporating the prior ALJ's
    decision would have been sufficient under either standard, so the
28  distinction between the two standards (if any) is academic.

1    Here, the prior ALJ's credibility findings were sufficiently

2    specific.  Among other reasons, the ALJ discredited Plaintiff's

3    allegations of severe and debilitating pain, instability and emotional

4    symptoms as inconsistent with Plaintiff's daily activities (A.R. 15).

5    As summarized above, Plaintiff did not provide extensive testimony

6    concerning her purported limits; Plaintiff did, however, testify

7    concerning her extensive daily activities.  Such inconsistencies

8    between claimed incapacity and admitted daily activities amply support

9    the prior ALJ's rejection of Plaintiff's credibility.  See Thomas v.

10   Barnhart, 278 F.3d at 958-59 (inconsistency between the claimant's

11   testimony and the claimant's conduct supported the rejection of the

12   claimant's credibility); see also Burch v. Barnhart, 400 F.3d at 680-

13   812 (daily activities can constitute "clear and convincing reasons"

14   for discounting a claimant's testimony); Rollins v. Massanari, 261

15   F.3d 853, 857 (9th Cir. 2001) (claimant's testimony regarding daily

16   domestic activities undermined the credibility of her pain-related

17   testimony); Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999)

18   (inconsistencies between claimant's testimony and actions cited as a

19   clear and convincing reason for rejecting the claimant's testimony).

20

21   Moreover, even if the ALJ had erred in failing to provide

22   adequate reasons for rejecting Plaintiff's credibility, the Court

23   finds that any such error is harmless.  Plaintiff testified to her

24   extensive daily activities but did not testify to any greater

25   limitations than the ALJ found to exist.  See Carmickle v.

26   Commissioner, 533 F.3d at 1162-63 (where error in ALJ's credibility

27   determination does not negate in any way the validity of the ALJ's

28   ultimate nondisability determination, i.e., where there remains

substantial evidence supporting the ALJ's decision, such error is harmless).

**CONCLUSION**

For all of the reasons discussed herein, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED:  October 8, 2008.


_____/S/_____
                     CHARLES F. EICK
             UNITED STATES MAGISTRATE JUDGE